
George C. Paine, II
US Bankruptcy Judge
Dated: 01/28/09



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

In Re:

NASHVILLE SENIOR LIVING, ET AL.,[1]

Debtors

CASE NO. 08-07254
CHAPTER 11
(JOINTLY ADMINISTERED)
JUDGE GEORGE C. PAINE, II

## MEMORANDUM

This matter is before the court on Venable LLP's application seeking employment as counsel to the Official Committee of Unsecured Creditors counsel pursuant to 11 U.S.C. § 328, 330 and 1103 of the United States Bankruptcy Code. The debtors object to the application because: (1) Venable failed to make all required disclosures, and (2) Venable has an interest "adverse" to the Committee's. Venable responds that it represents the entire body of unsecured creditors and holds no adverse interest which would serve as an impediment to employment as Committee counsel. For the reasons cited herein, the court SUSTAINS the debtors' objection and DENIES the application of Venable as counsel to the Official Committee of Unsecured

---

[1] The Debtors in these cases are Nashville Senior Living, LLC, Anderson Senior Living Property, LLC, Charlotte Oakdale Property, LLC, Greensboro Oakdale Property, LLC, Mt. Pleasant Oakdale I Property, LLC, Mt. Pleasant Oakdale II Property, LLC, Pinehurst Oakdale Property, LLC, Winston-Salem Oakdale Property, LLC, Briarwood Retirement and Assisted Living Community, LLC, and Century Fields Retirement and Assisted Living Community, LLC.

Creditors.

On August 17 2008, each of the Carolina 7 Debtors filed a voluntary petition for relief under the Bankruptcy Code. At the time of the filing, each of the Carolina Debtors owned real property that was used a as a senior living facility.[2] GE Business Financial Services, Inc. ("GE") provided mortgage financing to the Carolina Debtors in the original principal amount of $57,820,000, and GE claimed to be secured by, among other things, a first priority mortgage or deed of trust on each of the Carolina Properties. The GE facility was a single loan to all of the Carolina Debtors on a joint and several basis, and the full amount was secured by all of the Carolina Properties. As of the Petition Date, the Carolina Debtors believed that the amount owed to GE was approximately $56 million.

After obtaining the GE loan, each Carolina Debtor sold fractional interests in its Carolina Property to approximately thirty non-debtor investors (each a "TIC" and, collectively, "TICs"). Each TIC is a limited liability company formed for the purpose of acquiring its interest in the Carolina Properties. Each TIC owned a fractional interest in each of the seven Carolina Properties. The TICs and the applicable Carolina Debtor held their respective interests in each Carolina Property as tenants-in-common pursuant to a Tenants In Common Agreement. The TICs collectively owned approximately 40% of each

---

[2] Each Carolina Debtor was a party to a long term ground lease (each, a "Master Lease") with a "Master Tenant." Each Master Lease provided for a long-term lease of the facility to the Master Tenant, and the Master Tenant was responsible for operating the facility; each Master Tenant entered into a management contract with Sunwest Management, Inc. ("SMI") pursuant to which SMI managed the facility on behalf of the Master Tenant; the Master Tenant, through SMI as manager, entered into leases with the residents of the facilities and contracts with vendors to provide services to the facilities.

Carolina Property while the applicable Carolina Debtor owned approximately 60%.

The United States Trustee's Office appointed an Official Committee of Tenant In Common Investors on October 2, 2008. On October 8, the debtors filed a Motion to Dissolve the TIC Committee, and on October 10, 2008 the debtors filed a motion to sell the Carolina 7 properties pursuant to 11 U.S.C. § 363(b) and (h). On October 17, 2008 Venable filed its application to be employed as counsel to the Official Committee of Tenant in Common Investors. Three days later Venable (and local counsel) filed an objection to the debtors' proposed sale motion. On November 20, 2008, the court entered an order granting the debtors' motion for sale over the objection of the TIC Committee.

An order was entered on December 18, 2008 that found that the United States Trustee had changed the Committee name from the "Official Committee of Tenant in Common Investors" to the "Official Committee of Unsecured Creditors" thereby rendering moot the debtors' motion to dissolve the TIC Committee. Venable then filed the present application to be employed as attorney for the Official Committee of Unsecured Creditors. That application was objected to by the debtors[3] and is the subject of this court's ruling.

The parties stipulated to the following:

---

[3] GE noted at the January 14, 2009 hearing that it supported the debtors' objection to Venable's application for employment. GE indicated that had it known prior to the hearing about the date of the Engagement Letter (discussed *infra*), it would have filed a written objection to Venable's employment application.

3-U.S. Bankruptcy Court, M.D. Tenn.

1. Prior to the filing of these bankruptcy cases, Venable did not represent any tenants in common ("TICs") individually or collectively, in connection with potential claims against debtors, Sunwest, or their 287 senior living affiliates (collectively, "Sunwest.").

2. After the filing of the bankruptcy cases, Venable was engaged by a steering committee (the "Steering Committee") whose members were tenants in common with respect to the Carolina 7 properties. . . There is no agreement regarding Venable's representation of the Steering Committee other than the Engagement Letter. Todd Batiste was the chairman of the Steering Committee.

3. The Steering Committee paid Venable a retainer of $15,000. Venable was advised that the source of the retainer was the holders of tenants in commons interest in the Carolina 7 properties. Venable understands that the Carolina 7 tenants in common contributed to a small fund of less than $45,000 to protect their interests and the retainer was paid from that small fund.

. . .

7. Venable has no knowledge of whether the Steering Committee is in existence. Other than the $15,000 discussed above, Venable does not have any formal or informal agreements for, or expectations of, payment from any tenants in common or the Steering Committee. In the event that Venable is not appointed counsel for the Committees, Venable has no reason to believe that it will receive any compensation for its services in these cases.

8. Venable does not know whether the Steering Committee has organizational documents or written agreements of any sort.

. . .

10. On January 2, 2009, proposed counsel to the Committee sent a letter to counsel for the Debtors, demanding that certain claims be brought on behalf of the Bankruptcy Estates.

Venable asserts that it represented the Steering Committee for a period of approximately 30 days, and that its employment terminated on October 7, 2008 when the Official Committee (then TIC, now Unsecured) elected to retain Venable as official committee counsel. Venable was paid the $15,000 retainer, but states that since October 7, 2008, Venable's only representation

related to these cases has been to the Official Committees. According to Venable, the goal of the Committee is to reduce claims against the estate to get a greater return for all unsecured creditors.

Venable's position is untenable, as suggested by the debtors. Their actions demonstrate loyalty to the TICs and renders them incapable of serving as effective counsel to all unsecured creditors. The debtors' proof showed Venable's inclination toward the TICs to the possible detriment of other unsecured creditors.[4] Such examples of Venable's TIC partiality include:

1.   <u>"Ghost Writing"</u>- It appears Venable was "ghost writing" pleadings for some of the individual TICs. The TICs' "Expedited Motion for Allocation of Purchase Price" was filed on November 26, 2008 by various TICs. Those individual TICs asked the court to allocate the purchase price among the seven Carolina properties sold by the debtor pursuant to 11 U.S.C. §§ 363(b) and (h). The motion was filed by a local attorney, supposedly independent of the Committee, but contains at least two references to the Committee.[5] Less than a week later, an "Amended Expedited Motion for Allocation of Purchase Price" was filed removing the first reference to the "Committee," but the second reference in the prayer for relief remained.

2.   <u>Tax Consequences</u>- Though Venable now contends it seeks only to reduce claims against the estate for the benefit of all unsecured creditors, Venable's actions indicate that they have sought to reduce potential tax

---

[4] After the Official Committee of Tenants In Common was renamed the Official Committee of Unsecured Creditors, Venable filed a reply to the debtors' objection to Venable's retention as counsel to the Unsecured Creditors Committee. Venable argues that:

> First, the Committee has not been re-constituted. It is the same Committee that it has always been, just with a different name. The Committee is therefore representing the same interests now as it was before its name change.

[5] The first reference states: "The Committee suggests that this Expedited Motion be heard at the earliest possible time so as not to delay the sale of the properties . . . ." The second reference states:

> WHEREFORE, for the reasons set forth above, the Committee respectfully requests that the Court enter an order granting this Emergency Motion for Allocation of Purchase Price and further granting the Tenants in Common such other and further relief to which it may be entitled.

5-U.S. Bankruptcy Court, M.D. Tenn.

liabilities as to the TICs.[6]:

    a) <u>Stay Pending Appeal</u>- After the Carolina 7 properties were sold, Committee counsel filed a notice of appeal and sought a stay pending appeal. The "Emergency Motion for Stay Pending Appeal" is replete with references to the potential tax consequences to the TICs if a stay is not granted to stop the Carolina 7 properties sale. The tax consequences to the TICs is mentioned at least ten times in the stay pending appeal motion.[7] The motion for stay pending appeal was denied by the Bankruptcy Appellate Panel.

    b) <u>Motion to Reconsider</u>- The Committee filed a motion asking the BAP to reconsider the denial of the stay. GE, the largest unsecured creditor in this case, supported the debtors' sale of the Carolina 7 properties, but no mention is made of their position as the Committee continues to prosecute the appeal seeking to set aside or at the very least stay the sale.

3.    <u>Demand Letter</u>- On January 9 2009, proposed counsel to the Committee sent a letter to counsel for the debtors demanding that the debtor (1) take action to collect certain accounts receivable; (2) bring preference actions to recover claims against insiders, GE, Canyon Creek Development, Inc., and Canyon Creek Financial LLC; (3) bring an action against Canyon Creek Development, Inc. for fraud, negligence, misrepresentation and violation of applicable securities laws in connection with the offering of the sale of the TIC interests; (4) bring an action against GE on lender liabilities theories, and (5)

> [f]inally, for their participation in wrongfully assisting the Debtors in breaching the Tenants in Common Agreements, and receiving the benefits of such wrongful breaches, causes of actions lie in favor of the estates against some or all of ***the law firms representing the Debtors in these bankruptcy cases.*** Such causes of action include but are not limited to tortious interference with contract and negligence.

Proposed Committee counsel makes demands on the debtors to bring claims against GE and even the debtors' own lawyers, but does not demand that the debtors pursue claims against the TICs under the Debt Assumption and Indemnity Agreement. According to the debtors, the single largest asset of the estate is the claim against the TICs under the Debt Assumption and Indemnity Agreement wherein the TIC owners agreed to assume

---

[6] GE holds the largest unsecured claim in this case but is not a Committee member. GE supported the sale of the Carolina 7 properties and objected to the Committee's prosecution of the appeal of the sale order.

[7] For example, the motion states: "the sale will cause significant adverse negative tax consequences to the TIC Owners."

responsibility for approximately $14,000,000.00 of the debt owed to GE.

Failure of the Committee to demand that the TICs be pursued under the Debt Assumption Agreement is a glaring omission. This "omission" reflects that the real party in interest is not the unsecured creditors but the TICs and Venable has tied itself inextricably to the TICs to the detriment of other unsecured creditors.

The Bankruptcy Court for the Southern District of Ohio explained counsel Committee's role:

> "A creditors' committee stands as a fiduciary to the class of creditors it represents." **In re Caldor, Inc.**, 193 B.R. 165, 169 (Bankr.S.D.N.Y.1996). Its purpose " 'is to advise the creditors of their rights and the proper course of action in the bankruptcy proceedings.' " **Id.** (**quoting Bohack Corp. v. Gulf & Western Indus.**, 607 F.2d 258, 262 n. 4 (2nd Cir.1979)(citations omitted)). Therefore, under 11 U.S.C. § 1103(c), a creditors' committee may:
>
>> (1) consult with the trustee or debtor in possession concerning the administration of the case;
>>
>> (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtors' business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
>>
>> (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan.
>
> 11 U.S.C. § 1103(c). To accomplish this, a committee may "select and authorize the employment ... of one or more attorneys, accountants, or other agents, to represent or perform services for such committee." 11 U.S.C. § 1103(a). Therefore, the professionals that a committee retains owe a fiduciary duty to the committee. **Caldor**, 193 B.R. at 170 (**citing In re Arlan's Dept. Stores, Inc.**, 615 F.2d 925, 943-44 (2d Cir.1979); **In re Mesta Mach. Co.**, 67 B.R. 151, 158 (Bankr.W.D.Pa.1986); **In re Oliver's Stores, Inc.**, 79 B.R. 588, 597 (Bankr.D.N.J.1987) ("the integrity of the bankruptcy system demands that the professionals

> serving the committee not place themselves in a situation where their independence, loyalty and integrity can be questioned by the unsecured creditor body whom they represent")). The professionals retained by the committee may seek compensation from the estate as an administrative expense. 11 U.S.C. § 503(b)(4).
>
> While public policy does favor allowing parties to retain the professionals of their own choosing, **Caldor,** 193 B.R. at 170, limitations on the committee's right to retain professionals do exist. **Id.**
>
> An attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.
>
> 11 U.S.C. § 1103(b) (emphasis added). Likewise, under 11 U.S.C. § 328(c), the compensation requested by a professional person retained under § 1103 will be disallowed, if during employment, that professional is not disinterested or holds an interest adverse to the interest of the estate with regard to the matter on which the professional is employed. 11 U.S.C. § 328(c). "The statutory requirements of 'disinterestedness' and no interest 'adverse to the estate' 'serve the important policy of ensuring that all professionals ... tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.' " **Kravit, Gass & Weber, S.C. v. Michel ( In re Crivello)**, 134 F.3d 831, 836 (7th Cir.1998) (**quoting Rome v. Braunstein**, 19 F.3d 54, 58 (1st Cir.1994)).

**In re Greystone Holdings, L.L.C.**, 305 B.R. 456, 460 (Bankr. N.D. Ohio, 2003). The court in **Greystone** goes on to explain the DUAL requirements of "disinterestedness" (incorporated by 11 U.S.C. § 328) and "adverse interest":

> "Disinterested person" is defined in the Bankruptcy Code as one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor .... or for any other reason." 11 U.S.C. § 101(14)(E) (emphasis added). "The latter portion of the definition, which is referred to as the 'catch-all clause,' is sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.' " **Crivello**, 134 F.3d at 835 (7th Cir.1998) (**quoting In

re BH & P Inc., 949 F.2d 1300, 1308 (3rd Cir.1991) (citations omitted)). "The definition of disinterestedness in the Code covers not only actual impropriety, but the appearance of impropriety as well." **In re Paolino**, 80 B.R. 341, 345 (Bankr.E.D.Pa.1987).

"Adverse interest" is not defined in the Bankruptcy Code, **Caldor**, 193 B.R. at 171, but the oft-cited definition of adverse interest is:

> (1) to possess ... an economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

**In re Fretter**, 219 B.R. 769, 777 (Bankr.N.D.Ohio 1998) (**quoting In re Roberts**, 46 B.R. 815, 826-27 (Bankr.D.Utah 1985), **rev'd in part on other grounds**, 75 B.R. 402 (D.Utah 1987)). " '[I]nterests are not considered "adverse" merely because it is possible to conceive a set of circumstances under which they might clash.' " **Caldor**, 193 B.R. at 172 (**quoting In re Leslie Fay Co., Inc.**, 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994)); **In re Martin**, 817 F.2d 175, 183 (1st Cir.1987) ("[H]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending counsel away to lick his wounds."); **In re Kelton Motors, Inc**., 109 B.R. 641, 650 (Bankr.D.Vt.1989) ("mere hypothetical conflicts do not meet the heavy burden of proof to warrant disqualification of DIP's attorney") (citation omitted).

**Greystone**, 305 B.R. at 460-61.

Based on the proof before it, the court can only find that Venable must be disqualified as Committee counsel. Venable's actions as proposed Committee counsel have shown that they cannot "tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities" to represent ALL of the unsecured creditors. **Id.** at 460.[8] The Committee is comprised only of TICs, but Venable, as Committee counsel, is bound by fiduciary duties to represent all unsecured creditors.[9] The court

---

[8] GE's deficiency claim makes it the largest unsecured creditor. The debtors also have about $130,000 to $140,000 unsecured claims held by trade creditors.

[9] An Official Committee of Unsecured Creditors represents all unsecured creditors and has fiduciary duties to represent equally the interests of all of its constituents. **See** 7 **COLLIER ON BANKRUPTCY** ¶ 1103.05[2] (15th ed. Rev'd 2002); **see also In re Artra Group**, 308

therefore SUSTAINS the debtors' objection to Venable's application for employment as Committee counsel.

The debtor also argues that Venable should be disqualified as Committee counsel based on counsel's failure to make proper disclosures pursuant to 11 U.S.C. § 1103 and Federal Rule of Bankruptcy Procedure 2014. More specifically, the debtor points out that Venable attorney Gregory Cross' Declaration states:

> . . . neither I, Venable, nor any partner of, associate of, or of counsel to the Firm represents any party in interest (or its attorney or accountants) in connection with the Debtor's chapter 11 cases, or has any connection with the United States Trustee or any person employed in the Office of the United States Trustee.

The affidavit is signed by Venable attorney, Gregory Cross, and is dated October 9th, 2008. An additional disclosure was filed by the Venable firm on December 5, 2008 that provides in relevant part as follows:

> After the filing of this case but prior to the appointment of the Committee, Venable represented an unofficial steering committee whose members are creditors in this case and some of whom are members of the Committee. Venable's representation was limited to conferring with the steering committee, reviewing operative documents and advising the steering committee with respect to securing the appointment of an official creditors committee by the United States Trustee. Venable has not represented the steering committee since the Committee's application.

Thus, according to Venable's declarations, their representation of the steering committee terminated prior to their application to become counsel to the Unsecured Creditors Committee. However, Venable's Engagement Letter is dated October 17, 2008, after Mr. Cross's declaration was signed. The

---

B.R. 851, 857 (Bankr. N.D. Ill., 2003) ("An official committee of unsecured creditors is a paradigm example of a party that is accountable to another. This Committee owes a fiduciary duty to the class of unsecured creditors as a whole."); **In re Drexel Burnham Lambert Group, Inc.**, 138 B.R. 717 (Bankr. S.D.N.Y. 1992) (counsel for unsecured committee owes fiduciary duty to all unsecured claimants).

appearance, if not the reality, therefore, is that Venable's Engagement Letter with the Steering Committee was signed the very day that Venable filed its Application seeking employment to be counsel to the Official Committee.

In addition, the Venable declaration states that there were no promises of compensation. However, the October 17 Engagement Letter signed with the steering committee requires payment of a $15,000 retainer. According to the parties' Stipulations, Venable was paid the $15,000 retainer. However, Mr. Cross's Declaration (dated October 9) filed to support Venable's employment application, states:

> No promises have been received by Venable or any partner, counsel or associate thereof as to payment of compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code. Venable has no agreement with any other entity to share with such entity any compensation received by Venable or by such entity.

The Disclosures made were accidently inaccurate at best and inconsistent at worst. Either way, the disclosures should have been more carefully made. "If the duty to properly disclose is neglected, however innocently, the attorney performs services at his peril." **Hancock v. Limor,** 2007 WL 4481436 at *6 (M.D. Tenn. Dec. 18, 2007) **(quoting In re Coastal Equities, Inc**., 39 B.R. 304, 398 (Bankr. S.D. Cal. 1984)).

Under either an adverse interest/disinterestedness theory or a disclosure theory, the court finds that Venable's application for employment as counsel to the Unsecured Creditor's Committee's must be DENIED. The court will direct counsel for the debtors to prepare an order not inconsistent with the court within ten (10) days of entry of this Memorandum.

11-U.S. Bankruptcy Court, M.D. Tenn.

**THIS MEMORANDUM WAS SIGNED AND ENTERED ELECTRONICALLY
AS INDICATED AT THE TOP OF THE FIRST PAGE.**

12-U.S. Bankruptcy Court, M.D. Tenn.

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.